Good morning, your honors. May it please the court, my name is Jamie Lee Moore. I represent the appellate Jason Payne, and I'm going to be arguing the case for both defendants today. They're brothers, and the case issues are identical. I think at this juncture, what I'd like to say is this is a due process case, and I think as we all learned in law school, due process requires two things. Adequate notice, and an opportunity to be heard that is meaningful. Both of those things were denied in this case after the trial. This is a case where after the trial, it was discovered that the juror who was sitting closest to the prosecutor's table and the lead detective started a dating relationship with that detective a couple of hours after the verdict. And it came to light that they had gone to the same high school together, and they immediately started dating, and dated about once a week. This information did not come to light right away, though. The prosecutor learned about it the week after the trial, but then didn't tell the trial court until it was pretty much common knowledge among the defense and the prosecution bar that these two individuals were dating after this murder trial verdict. So it was about a month or six weeks before he finally alerted the trial court about this problem. So then the trial court has a hearing and determines there was no improper relationship before the verdict. The trial court held a hearing and heard testimony from the juror and the detective. That testimony was self-serving. They both were dating at the time that they made their testimony. They also talked about their testimony in advance. And the detective and the juror both testified that, you know, they talked about it, they knew the issue was whether they had contact during the trial prior to the verdict, and he basically told her, well, you don't have anything to worry about since, you know, nothing, we didn't start dating until after the verdict. So while the trial court did have part of its investigation in the form of a hearing, it did not finish its investigation, because it did subsequently order the prosecutor to submit a declaration stating how he found out about this whole thing and who told him about it. Unfortunately, that declaration didn't get filed with the court until almost five years later, when the trial court no longer had jurisdiction of the case, and the court of appeal had it. And so the trial court never really finished its own investigation of what really went on between this juror and this detective. What else would you have liked to have had the trial court do? Well, the other, that's sort of the notice aspect. The opportunity to be heard aspect is frankly our strongest argument, I think, because essentially the trial court issued a gag order repeatedly disallowing the defense to talk to anyone about this dating relationship, except for, you know, the people who are in the proceedings. And the pre-deceitings were sealed. So the defense was hampered for, well, to this very day we're not allowed to speak to anybody about this dating relationship because of these gag orders that were issued. And so when you have a situation where defense counsel can't even investigate the juror bias to make sure that their self-serving testimony about when their relationship began is, in fact, true, you have a really serious due process problem, because you have counsel who can't cross-examine these individuals or present any evidence of actual bias. Now, the U.S. Supreme Court has been pretty clear through the years, going back to the 30s, that when you have a claim of juror bias, the defendant has an opportunity at an evidentiary hearing to prove bias, whether it's actual or implied bias. And that is what we're saying we were denied. And we were denied that because of the gag orders, because of the sealing of the transcripts, the inability to do anything, and the delayed information from the prosecutor, and the fact that he didn't submit his declaration until long after the trial court lost jurisdiction to do anything about it. And, frankly, I don't think it would be a surprise to the trial court to see this case come back, because he realized and openly stated in the record that he dropped the ball. So, you know, it was one of those cases that was big and bungling and a lot of things were going on. The trial court lost track of it. The prosecutor lost track of it. The defense attorneys lost track of it. This is one of those situations where due process was denied because things just fell through the cracks. So that's the essence of what the claim is. And I think that it's important to notice that Mr. Payne had no criminal record prior to this crime. There were witnesses who were all impeached. And believe me, if you grow up in North Richmond, it's a pretty tall order to grow up without a criminal record of any kind. So, you know, this is an unusual defendant in an unusual case. And it was a close call. There was a mistrial the first time they tried this case. It was a two-month trial. The jury verdict form says we are unable to reach a verdict. And this tried two other times for other reasons that don't have anything to do with the jury. And then this fourth trial was their final shot at getting this case to resolve. And, you know, there was a lot at stake at this point. The lead investigator, Harrison, was heavily, heavily impeached before the trial, during the trial, after the trial, by other trials. He was under attack based on his character and his ways of investigating over and over again. He even admitted on the stand that he would sometimes lie to people to get them to say what he wanted them to say. So it's no stretch for the trial court to have asked for a declaration from the prosecutor to tell us who told you about this relationship. Let's talk about it. Let's find out what happened a little bit more than just the self-serving testimony, the coach testimony of the juror and the detective. Because, frankly, the judge saw this trial not once, but twice. So he knew that the investigator had a lot at stake. His character was definitely impeached repeatedly. And he felt that it was appropriate for due process to obtain more information about the situation. This juror and this detective, there's no question. I mean, it doesn't even pass the straight face test. There's no question that something went on between them during the trial. I mean, they sat across from each other only a few feet away for about two months. I think it was a 26-day trial, so that's eight hours, 26 days. They had gone to the same high school, although they did claim that they didn't know each other. But, you know, Campolino High School, I don't know whether it's a very large school, but my guess is where it's located it can't be too terribly large. They immediately got somehow or another, everybody got together and had a celebratory lunch after a serious murder trial where the prosecutor attended, the three detectives attended, six jurors approximately, according to the testimony, and the court reporter attended this lunch where there were drinks and it went on for several hours. And this detective and this juror sat next to each other. He asked for her phone number. She gave it to him. He called her the next day. They went out that weekend. It just doesn't pass the straight face test to say that nothing passed between them. They had continuous nonverbal contact during this trial. So when does nonverbal contact finally equate to actual bias in a legal sense? Assuming that there's some chemistry that's going on, why is that enough? I think it is enough because of the timing and the stakes in this case. I think it's enough because it can persuade a juror. You know, impartiality is not a technical term. It is a state of mind. You know, the juror has to have an impartial state of mind. And if they're persuaded because they have an attraction to the lead investigator who's sitting there and who she sees every day. And, you know, there's definitely dead time during trials. We all know this. There's times when the jury's sitting in there, detectives are sitting in there, people are sitting in the audience, and, you know, the dogs are away. You know, the judge isn't on the bench. People are sitting around milling around. And even though they may not be conscious of the fact that they're communicating in a nonverbal fashion, they are. And it's just one of those cases that really makes you wonder, well, you know, this detective had a lot at stake. He left the force shortly after this trial. He needed to get it closed. He'd already tried it once. It was a close case. It wasn't a slam dunk. You know, the evidence is overwhelming of guilt. It was definitely a close case. And in that situation, it's entirely possible that nonverbal attraction could persuade a juror. And it certainly seems to, it seems that it doesn't have the appearance of impropriety and seriousness that a murder trial should have, both for the defendants and for the victim's family. Judge Gould has a question. Yes, Judge Gould. I'm sorry to interrupt, but I'd like to ask you to focus this on the standard for a minute. Sure. Under which we are restricted with a state prisoner habeas case so that you know how. I guess you have to show that this circumstance is contrary to some Supreme Court precedent on bias and due process or is an unreasonable application of it. What's the Supreme Court precedent that we're supposed to look to to say that there was a due process violation? Yes, I think the court can look to United States v. Wood, the Phillips v. Smith, or excuse me, Smith v. Phillips and the Remmer cases. All of those cases say in a situation of juror bias, and all three of them acknowledge that bias can be actual or implied, so it's part of the same package. In those cases, the defendant should be offered an opportunity for an evidentiary hearing with an opportunity to prove bias. So that to me is the controlling Supreme Court authority. Does that answer your question? It approaches it, but now since the court did hold a hearing and questioned both the detective and the juror, then what's the added wrinkle that says, okay, the court held a hearing, but it wasn't enough of a hearing? In other words, I understand those cases mean there has to be a hearing on bias, but here I thought that there was one. So what's our handle with a Supreme Court case that says, although there was a hearing, it was not an adequate hearing? Or exactly what is your argument that in light of the fact a hearing was held by that judge, that there is a due process violation on bias? Two things. First, the gag orders. Not allowing the defense to talk to anyone outside the proceedings about what went on between these two individuals during the trial, that's the first thing. I think that you can't tell the defense to prove bias and not allow them to talk to anyone, any witnesses about it. So I think that's the first due process issue that I think the Supreme Court would say it's not an adequate because you didn't give them an opportunity to prove bias. The second is the declaration of the prosecutor. That should have been provided early on. He was a witness. He was a witness to the situation. Should have provided the information ahead of time so that the defense could have a meaningful opportunity to cross-examine the detective and the juror. I think that those are the two issues. Dave, thanks. You've got about a minute and 30 left. Do you want to reserve that? Yeah, I'll reserve that. Thank you. We're from the state. Thank you, Your Honors. And may it please the Court, I'm Katherine Rivlin from the State Attorney General's Office. Could you adjust your mic down just a little bit so we can hear you? I will do that. I am not the tallest deputy in the stack. Thank you. If I were to prosecute someone for their, and I think I have the quote right, unconscious, nonverbal behavior, I'm not even quite sure how I would investigate that, short of an admission like Jimmy Carter saying he had sinned in his heart. I just don't know what they were going to ask the other 11 jurors if their claim is that the court, you know, properly believed that there was nothing going on until they discovered each other at this lunch, but that there might have been unconscious, nonverbal behavior going on before that. We've gotten beyond the realm of the reasonable here. And just to bring us back to the AEDPA standard, if the trial court has a hearing and investigates and investigates the two people who are involved and asks them, are you involved? And they say, yes, they're forthcoming. It's a social relationship. When did you become involved? And each explains. One of the other jurors, we were not sitting together, but one of the other jurors mentioned Campolindo because her child was going there. And we realized that we had both gone there, but were not in the same class and didn't know each other. And we talked about it. And that led to something else, a social relationship. You know, the problem, I realize that the claims here are somewhat narrow, but doesn't it disturb you that the prosecutor and the key witnesses are going out drinking with the jurors after the verdict? I mean, I just don't understand why the trial court wouldn't have said, everybody come in here. Who invited the jurors? I mean, how did this communication go? Actually, there was some discussion on the record about it, and I believe it's in the excerpts. The jurors were going out, and they invited the others to come with them. And Officer Harrison had not been in the courtroom at that point. He was on vacation, but happened to be coming through the courthouse at the point at which they were all heading out to lunch. So it was fortuitous. It was sort of accidental and spontaneous. I wouldn't use the word fortuitous. Well, serendipitous. I'm searching the mental lexicon. But the point is this, that the Court did investigate, and the Court's investigation was enough to convince it, the Court, that both witnesses were telling the truth about this. Counsel, it's just cool if I could ask you a question. Your Honor. So I understand the Court talked to the two witnesses, the detective and the juror. But didn't the Court let the defense talk to the other jurors to discover or investigate? Is that right? So here's my problem. I'm sure, though not from personal knowledge, but in terms of human nature I'm sure that often after the experience of a long trial, people will get together afterwards. There could be relationships that start. So this may be totally innocent. But what if the judge accepted a story that wasn't true? What if the detective and the juror said we started our relationship after this party, luncheon party, and never before, but that wasn't correct, and some other juror had knowledge that they had been dating during the trial? How would the procedure that was followed have tested that? The Court talked to the two parties involved under oath in a hearing, cross-examined by counsel, and the Court made a credibility determination based on demeanor and the facts the Court had heard. And other than to say that sometime in the history of the criminal justice system people have lied and gotten away with it, we can't undo the standard that the trial court is required to investigate up to the point where it reasonably determines it doesn't have to investigate further. And that's where this Court got once he believed Juror 12. Let me ask you a follow-up question. Yes. I certainly understand the Court believed the juror and the detective and may have had really good reasons for doing so.  It's possible that the juror could have confided something to another juror on the panel or another juror on the panel might have seen the detective in that juror number 12 or whatever, you know, taking some time together that wasn't revealed to the trial court. So why shouldn't the defense counsel have at least had the opportunity to ask around and ask some questions, do some discovery and look into this? I realize there's some danger of this becoming sort of a witch hunt on, you know, innocent behavior, but it doesn't seem like the defendants who got convicted of murder had a full and fair chance to look into this. Your Honor, let's look at this from the point of view of a criminal justice system that has to be able to encourage the participation of citizens in the process. And if we get to the point where what a juror does after that juror is dismissed renders it open season to investigate anybody she might have run into in a grocery store or had drinks with after the trial, I think there has to be the possibility that a trial court can reasonably draw the line, can make the decision it is only what it appears to be and what they've told me that it is, and further violations of this officer's privacy and this now private citizen, former juror's privacy are completely unnecessary to my determination of what's going on. And I think that court reasonably reached that determination with concern really for the entire criminal justice system in my own part. But of course part of the justice system is to make sure we don't have bias in it and that these things are fully aired. Now, just wait a minute. Here you have, first of all, you have the prosecution out drinking with the jurors. And whether the jurors initiated it or not, then there's a relationship that may have started that. Then the prosecutor is ordered to give an affidavit. It turns out he's a precipient witness. He's ordered to give an affidavit and he doesn't do it for a while. And then there's this long line. There's a gag order. I mean, from the outside, even if there's nothing there, I've got to say it looks pretty bad. And so I think you altered the – you didn't quite get to Judge Gould's question, which is on my mind, to why shouldn't the trial court have allowed the defense to go forward and do some preliminary investigation because it's a pretty – if they were dating, it's a serious – obviously, it's a cause for a new trial. They say they weren't. Fine. And the defense counsel says, I'd like to do some investigation. Well, why shouldn't the trial court have allowed that? Because the trial court had reached the determination that there was no there there and nothing to investigate on the basis of having looked them both in the eye, had them examined, cross-examined, re-examined, recrossed in his courtroom. He had reached a, what we would find under Edwin, a reasonable determination that there was – that he had investigated and there was no there there. So why did he have the subsequent hearings and ask the prosecutors if he had already reached that decision? Because he's scared of you, Your Honor. We're not that scary. But it – precisely. I mean, I don't know what – I guess sitting there, the court's doing its own investigation, but it's not allowing defense counsel to do an investigation. That's the – that's the issue. And probably if he said, all right, I'll give you a limited amount of investigation, it may have turned up nothing. But we don't know. But not before – We don't know. Right. But not before this officer who's separated had had his, you know, family tested about how often he spends the night there and not before, you know, all the things that would have happened. The question is, do you get to talk to the jurors and say, do you know anything? And they said no. But the answer, you'd hope from the prosecutor's point of view, is I didn't see anything and the juror was fair. Didn't see any evidence of actual bias. But we don't know. And we don't know because the question would have been, you know, a series of prying questions into the privacy of this juror who served on the case. Well, I understand your concern for the juror's privacy, and I respect it. Absolutely. And the officer's privacy. But also, if she's not telling the truth, then we've got two people spending a lot of years in prison based on an actual biased juror. That's the tradeoff. And you've got embarrassment, potentially, or somebody who's in jail wrongfully. We've got two people spending time in prison because they committed murder, Your Honor. Yeah. But I understand that. But the process by which we put them there has to be fair. That's the part of it. And I absolutely agree. And had the judge had any doubts about the truth of what the juror was saying, clearly he was ready to do more if he needed to. But he found the juror was telling the truth and that there was nothing to investigate. Counsel, if I could interject on it. You know, it's obvious the judge thought they were telling the truth. And they looked him in the eye and they told him what they told him, and he believed it. And that's probably the case. But I certainly, even though it's been a while, I can remember cases I tried where witnesses would look the judge in the eye and make a statement that was not the truth. And it only came out that it was not the truth because some lawyer had found a document or another witness that could be put out to confront their story, in which case it would fall apart or be discredited. So the part of this case that bothers me is just to not let the defense ask the other jurors questions because such questions conceivably could reveal if they had been dating during the trial. That's not what they wanted to ask, Your Honor. They wanted to ask about unconscious, nonverbal behavior and all kinds of craziness. But let's take a typical actual bias case. What usually happens is if some juror comes forward after a trial and says the judge so-and-so knew a witness or there's a way of information to believe that the juror lied in voir dire or that the juror exhibited actual bias, generally speaking, the trial judge will haul in all the jurors and ask about what happened in the jury room, what they observed. I mean, that's a minimal intrusion compared to what I think the specter you're throwing up, which is a wide-ranging investigation of personal lives. That's inquiry. Well, but the basis on which the request went to the court to let us talk to these jurors about, you know, was she leaning too close? Was she whatever? It just seems to me that the court was a reasonable jurist can disagree, and that's the standard. That's the beauty of it. But it seems clear on this record that this court made a reasonable determination that it had investigated enough when it got the testimony of the two people involved that it happened afterwards. And once that afterwards was established in the court's mind, and on the basis of substantial evidence, it is not within any of our powers to go back and say that the court should have questioned its own ability to determine the facts and brought in a bunch of jurors who could only have testified to before when it had determined that the only conduct was after. And that was a reasonable determination by the trial court. The court of appeal was reasonable to find it was reasonable, and we believe that the district court was well within its authority to find under AEDPA that it was reasonable. Any further questions? Thank you, counsel. Thank you. Just want to clarify a couple of things. The trial court made a finding that he believed the juror, but he didn't necessarily make a finding that he believed Harrison. That's why he ordered Kensock's declaration. It was because defense was saying we're concerned about his credibility and his character. We want to know more about how this all came about. But if the trial court believed her, why would that make any difference? Because as defense counsel stated in his argument for obtaining the information, she may have misconstrued things. She may have, you know. But isn't her testimony the one support, even if she misconstrued something? Even if she misconstrued something, that would not show that she was actually biased. Quite the contrary. Well, it might actually. One of the problems with this, with the trial court's investigation of the jurors, that he never asked her anything about bias, wouldn't allow questions about when she became attracted to him, for example. That question was objected to and sustained. That is really what this is about. When did she become attracted to him? Which, in this case, it says attraction is equivalent to bias. Well, I think it's definitely. I think if you're attracted to someone, you're more inclined to agree with them. Right, but the actual bias standard that we use for constitutional laws is more than that, isn't it? True, but bias, as the Supreme Court has told us since the 30s, can be actual or implied. So, implied bias also. If that's the case, wouldn't we be, couldn't you reexamine all of the jurors to find out how many of the other jurors were also attracted to Mr. Harrison? I mean, why would that make a difference? It makes a difference because not all the other jurors went out with him the next day or two hours after the verdict. That's what makes the difference. Well, there were six of them who went out with him. Right, but she was the one sitting next to him, and she was the one that gave him her phone number and went out with him the next day. She doesn't give her phone number to somebody else that was there. So, apparently, she's pretty popular. I think the court, you know, big picture. I mean, I think it's important for the courts to let the lower courts know that these cases need to be taken seriously. There needs to be an appearance of impropriety, and everybody should be on, you know, the officers should know better. Well, they should, but that's for the state to deal with administratively rather than us. I mean, the only question is, what if you're actually biased, and do you get a hearing on it? Yeah, but when it rises to a situation where defense counsel is not allowed to investigate or to make any kind of... Or apparently to drink with them. Apparently to drink with them either. Correct. So, I'm almost out of time here, so I just wanted to just point out, you know, the trial court, you know, the trial court didn't make its finding. It ordered Kansak's declaration and then said, I will figure out what I'm going to do next after I get it. He left that ballgame hanging. It was... The ball was in the air. It wasn't finished yet, and it never got completed, because that declaration didn't come until five years later after the trial court no longer had jurisdiction to do anything with it. So, he never really did make a finding. He made an initial inclination. But you do have findings by the Court of Appeal. I have a finding by the Court of Appeal that basically says, we agree with the trial court, but how can they agree with something that was never found? How can they agree that there was no bias when the trial court never found there was no bias? I mean, it's a non sequitur. And that's kind of what we're asking for. We're asking for an evidentiary hearing because that's what the Court of Appeal should have done. They should have sent this thing back to the trial court and said, finish your investigation, give defense counsel their opportunity to prove actual bias as the U.S. Supreme Court requires, and then go on. Did you take this to the California Supreme Court? I'm sorry? Did you take this to the California Supreme Court? We did, and review was denied summarily, so. Did you file for cert? No, they did not file for cert. Any further questions? Thank you both for your arguments. Thank you. Interesting case, and we will take it under submission.
judges: Thomas, Gould, Bybee